UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BEVERLY BALLARD, | ) | |
| | ) | |
| Plaintiff, | ) | No. 10 C 1740 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| CHICAGO PARK DISTRICT, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Beverly Ballard filed this suit under the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601 *et seq.*, alleging that her former employer, Chicago Park District, denied Ballard her rights under the FMLA.[1] Defendant Park District moves for summary judgment. R. 36. For the reasons discussed below, the Park District's motion for summary judgment is denied.

**I.**

In evaluating the summary judgment motion, the Court views the facts in the light most favorable to the non-movant, Ballard. Defendant Chicago Park District is a local public entity that offers recreational facilities and activities, including swimming facilities with lifeguards provided through the Department of Beaches and Pools. R. 38, Def.'s Stmt. of Facts (DSOF) ¶ 1. Plaintiff Beverly Ballard began working for the Park District in 1983 as a lifeguard and assumed other positions over the years,

---

[1]This court has jurisdiction under 28 U.S.C. § 1331 over this federal-law action, provided for by 29 U.S.C. § 2617(a)(2), which covers public agency employers such as the Chicago Park District, 29 U.S.C. § 2611(4)(A)(iii).

including that of Hourly Natatorium Instructor, a position held by Ballard at all times relevant to this case. *Id.* ¶ 4. In this position, Ballard accumulated leave time for personal days and sick time, but not vacation days. *Id.*

In early 2006, Ballard's mother, Sarah Ballard, was diagnosed with end-stage congestive heart failure, and was not expected to live. R. 45, Pl.'s Stmt. of Facts (PSOF) ¶ 1. Sarah Ballard lived with Ballard in Ballard's home. *Id.* As a result of her diagnosis, Sarah Ballard began receiving hospice services from Horizon Hospice & Palliative Care at Ballard's home. *Id.* Initially, a home-care nurse would come to Ballard's house five days a week and was on call if Ballard needed help. *Id.* As time went on, however, the hospice staff made fewer home visits as Ballard became more proficient in reading her mother's blood sugar level, monitoring her heart, and recognizing the signs of a massive heart attack or stroke. *Id.*

Although Ballard's teenaged daughter was also trained to care for Sarah Ballard, R. 38-1, Def.'s Exh. 1 (Ballard Dep.) at 24:22-26:15, Ballard was her mother's primary care giver. PSOF ¶ 2. Her responsibilities included preparing healthy meals; administering her mother's insulin shots and medicine; operating a pump to remove fluids from her mother's heart; bathing her mother; pushing her in a wheelchair; administering oxygen when her mother needed it; providing her mother with transportation; and making sure her mother was comfortable by saying soothing things to her, rubbing her back and head, and propping her up in bed. *Id.* ¶ 3.

On December 19, 2007, Ballard learned that she and her mother had been granted a trip to Las Vegas by the Fairygodmother Foundation, a charitable

2

organization which grants "wishes" to persons with terminal illnesses. R. 38-3, Def.'s Exh. 3 at Exh. 7-B. The trip was scheduled to take place from January 21, 2008 through January 26, 2008, *id.* at Exh. 12, and Ballard, as her mother's primary care giver, was to accompany her mother on the trip. *Id.* at Exh. 9.

Ballard alleges that on December 19, 2007, after learning of the Fairygodmother grant, she approached Park District supervisor Eric Fischer during a break at an Hourly Instructors' Meeting to request leave for the trip to Las Vegas. PSOF ¶¶ 17-18. Fischer was the Assistant Manager of Beaches and Pools, and Ballard's direct supervisor at the time. *Id.* ¶ 4. He had authority to approve time sheets and grant personal days to hourly Natotorium Instructors, but he did not have authority to approve FMLA leave requests. DSOF ¶ 2. Ballard claims that she handed Fischer the Fairygodmother Foundation letter notifying her of the grant, and wrote the dates of the Las Vegas trip on the back of the letter because Fischer wanted to know what dates she was requesting in connection with the trip. PSOF ¶ 18. Ballard alleges that she discussed FMLA leave with Fischer, but that he told her it was too soon (that is, too far in advance of the requested leave), he had a lot to handle, and that he would get back to her. *Id.* ¶ 20. Both Fischer and the Park District deny that this conversation ever happened, and claim that Fischer did not learn of Ballard's trip until Fischer received Ballard's faxed leave request in January 2008. R. 49, Def.'s Resp. to PSOF ¶¶ 17-20. (At the summary-judgment stage, the Court must credit Ballard's version.)

Ballard claims that because she did not hear back from Fischer, she tried to contact him again over the phone on January 14, 2008, but was told by his secretary

3

Erica that he was not available to respond. PSOF ¶ 25. The following day, Ballard spoke with Erica again, who told her to fax in a leave request form, which Ballard did. *Id.* ¶ 26. The Park District admits that it received a faxed leave request from Ballard on January 15, 2008, and that the form indicated that the request was for FMLA leave. R. 49, Def.'s Resp. to PSOF ¶ 26. But the Park District claims that the quality of the fax was so poor that Fischer initially thought it was a request for personal days and thus denied the request, citing "[n]ot enough benefit time. Location not covered." DSOF ¶ 25.

After receiving Fischer's denial, Ballard tried multiple times to reach him by phone on January 16, 17, and 18 to no avail, though his secretary Erica assured her that she was relaying her messages to Fischer. PSOF ¶ 28. The Park District denies that Ballard made any attempts to contact Fischer in the days leading up to her trip. R. 49, Def.'s Resp. to PSOF ¶ 28. Although Ballard had not received formal approval of her request for leave to travel with her mother, she believed that her FMLA leave would be approved based on her conversations with Erica, who had told her that if she got her paperwork in order, she would be fine. PSOF ¶ 31. Thus, Ballard left for Las Vegas with her mother on January 21, 2008 in spite of the fact that her January 15 request for leave had been denied. DSOF ¶ 34.

In addition to administering her mother's medication and looking after her mother during the trip, PSOF ¶ 33; Ballard Dep. at 208:23-209:4, Ballard spent time with her mother playing slots, shopping on the Strip, people-watching, and dining at restaurants. DSOF ¶¶ 42-45. Ballard admits that there were no plans for Sarah

4

Ballard to seek professional medical care, therapy, or treatment for her heart condition while in Las Vegas, nor did Horizon Hospice provide any services for Sarah Ballard during the trip. *Id.* ¶¶ 48, 49.

Ballard returned to work on January 28, 2008, which was a day later than her scheduled date of return. PSOF ¶ 34. Her delay was caused by a fire that had broken out in her Las Vegas hotel, which prevented her from making her original flight home. *Id.* On March 21, 2008, Ballard was fired for her allegedly unauthorized absences between January 21 - 27. *Id.* ¶ 39. She filed this lawsuit, and the Park District now moves for summary judgment.

## II.

Summary judgment must be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare v. UnitedHealth Group*, 629 F.3d 697, 704 (7th Cir. 2011) (citations omitted), and must consider only competent evidence of a type otherwise admissible at trial. *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) (citations omitted). The party seeking summary judgment has the initial burden of showing there is no genuine

5

dispute and they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008)). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 255.

## III.

Ballard alleges that the Park District willfully and intentionally interfered with her rights under the FMLA by denying her request for leave to accompany her sick mother to Las Vegas and then firing her for absences in connection with the trip. R. 1, Compl. ¶ 24.

The FMLA permits an eligible employee to take up to twelve weeks of leave per year "[i]n order to care for . . . [a] parent of the employee, if such . . . parent has a serious health condition." 29 U.S.C. § 2612(a)(1)(C). The Act further provides that employers may not "interfere with, restrain, or deny the exercise of or attempt to exercise, any right provided under [the Act]." *Id.* § 2615(a)(1).

To prevail on her claim for FMLA interference, Ballard must prove that (1) she was eligible for FMLA protections; (2) her employer was covered by the FMLA; (3) she was entitled to leave under the FMLA; (4) she provided sufficient notice of her intent to take FMLA leave; and (5) her employer denied her FMLA benefits to which she was entitled. *Righi v. SMC Corp.*, 632 F.3d 404, 408 (7th Cir. 2011). There are only two issues in serious dispute, one a legal question, the other a question over the factual record: (1) as a matter of law, whether Ballard was entitled to leave under the FMLA

6

to "care for" her mother on the trip; and (2) as a factual matter, whether there is a genuine issue of fact over whether Ballard provided sufficient notice of her intent to take FMLA leave. As for the legal issue, the Court addresses whether Ballard was entitled to FMLA leave under two theories: first, whether she "cared for" her mother during the trip to Las Vegas; and second, in the alternative, whether the trip itself was part of her mother's "ongoing treatment."

**A.**

Ballard argues that her trip to Las Vegas was protected under the FMLA because she "cared for" her mother during the trip. In response, the Park District argues that the FMLA does not protect that activity because Sarah Ballard had no plans to seek medical treatment in Las Vegas. In the Park District's view, the care must have some connection to the family member's need for treatment itself. The pertinent text of the FMLA does not, however, set forth that limitation. Under the FMLA, an eligible employee is entitled to a certain amount of leave "[i]n order to care for . . . [a] parent of the employee, if such . . . parent has a serious health condition." 29 U.S.C. § 2612(a)(1)(C). So the text demands only that the family member (here, the parent) must have a "serious health condition" and that the employee must use the leave "to care for" the parent. The statute does not mention the employee's direct participation in medical treatment. Nor does the statute mention limiting the care to when the parent is at a particular location.

Although the FMLA does not further spell out the meaning of the phrase "care for," the Department of Labor has issued regulations addressing the meaning of this

7

phrase. *See* 29 C.F.R. § 825.116 (eff. until Jan. 16, 2009).[2] Those regulations state that the phrase "needed to care for" encompasses both physical and psychological care, and

> includes situations where, for example, because of a serious health condition, the family member is unable to care for his or her own basic medical, hygienic, or nutritional needs or safety, or is unable to transport himself or herself to the doctor, etc. The term also includes providing psychological comfort and reassurance which would be beneficial to . . . a parent with a serious health condition who is receiving inpatient or home care.

*Id.* § 825.116(a). So what it means to "care" for a family member does *not* depend on a particular location or on participation in medical treatment itself. What's more, the regulations recognize, in defining "serious health condition," that terminally-ill family members might not be receiving active medical treatment at all: a serious health condition is a condition that involves "continuing treatment by a health care provider,"[3] including a

> period of incapacity which is permanent or long-term due to a condition for which treatment may not be effective. The employee or family member must be under the continuing supervision of, but *need not be receiving active treatment* by, a health care provider. Examples include Alzheimer's, a severe stroke, or the *terminal stages of a disease.*

---

[2] The regulations were most recently amended in 2009, after the events of this case occurred. Because regulations cannot be applied retroactively unless Congress has so authorized the administrative agency and the language of the regulations require it, *see Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988), this Court applies the version in effect as of January 2007 (when the trip occurred). *See Brown v. Auto Components Holdings, LLC*, 622 F.3d 685, 689-90 (7th Cir. 2010) (applying contemporaneous regulations).

[3] A condition that involves inpatient care also qualifies as a serious health condition. 29 C.F.R. § 825.114(a)(1) (1995).

8

29 C.F.R. § 825.114(a)(2)(iv) (1995) (emphases added) (available at 60 Fed. Reg. 2180-01, 2244 (1995)).[4]. The Labor Department appears to have derived this expansive view of "care for" and "serious health condition" from the legislative history of the FMLA. *See* 60 Fed. Reg. 2180-01, 2194-95 (1995) ("The Department has carefully reviewed the comments and re-examined the legislative history and the definition of 'serious health condition' in an attempt to assure that it is consistent with Congressional intent, and that FMLA leave is available in those situations where it is really needed.") Indeed, the Senate Report on the FMLA makes the same point about care and terminally-ill family members, that is, that the "care" need not be part of treatment:

> An employee could also take leave to care for a parent . . . of any age who is unable to care for his or her own basic hygienic or nutritional needs or safety. Examples include a parent or spouse whose daily living activities are impaired by such conditions as Alzheimer's disease, stroke, or clinical depression, or . . . who is in the final stages of a terminal illness.

S. Rep. No. 103-3, at 24 (1993), 1993 U.S.C.C.A.N. 3, 26.

Based on the statutory and regulatory text, there is no question that Sarah Ballard suffered from a covered "serious health condition," and was unable to care for her own basic medical, hygienic, or nutritional needs or safety. There is also no question[5] that the services Ballard provided her mother at home—preparing healthy meals; administering her mother's insulin shots and medicine; removing fluids from

---

[4] The current version of the regulation (which has the same text as the prior version) is codified at 29 C.F.R. § 825.115(d).

[5] To state the point more precisely, Ballard has shown that a reasonable fact-finder could find the facts necessary to deem Sarah Ballard as someone with a serious health condition and that Ballard took leave to "care for" her.

9

her mother's heart; bathing her; pushing her in a wheelchair; administering oxygen to her mother when needed; and providing her mother with transportation—constituted, at the very least, physical care within the meaning of the FMLA.[6] *See* PSOF ¶ 3.

It follows, then, that Ballard also "cared for" her mother during their trip to Las Vegas, because her mother's basic medical, hygienic, and nutritional needs did not change while she was there. Ballard did, in fact, continue to administer her mother's medication and look after her mother in Las Vegas. PSOF ¶ 33; Ballard Dep. at 208:23-209:4. But, as noted above, the Park District contends that Ballard did not "care for" her mother because there were no plans for Sarah Ballard to seek professional medical care, therapy, or treatment for her heart condition in Las Vegas, nor did Horizon Hospice provide any hospice services during the trip. DSOF ¶¶ 48, 49. As discussed above, there is no statutory or regulatory text stating something to the effect that "care" must involve some level of participation in the ongoing treatment of the family member's condition under the FMLA. To the contrary, the regulations cover terminal illnesses for which there is no active treatment at all, so the regulations refute an attempt to link "care" to participation in ongoing medical treatment.

It is true that the Park District can accurately cite to several court cases for the proposition that "care" includes an "ongoing treatment" connection. The primary case is the Ninth Circuit's decision in *Marchischeck v. San Mateo County*, 199 F.3d 1068

---

[6] Ballard arguably also provided psychological care by making sure her mother was comfortable by saying soothing things to her, rubbing her back and head, and propping her up in bed. PSOF ¶ 3.

(9th Cir. 1999). There, the court held that an employee's act of taking her son to the Philippines to live with relatives, although motivated by concern for her son's physical and psychological condition, did not constitute "care" within the meaning of the FMLA because she had no plans to seek medical or psychological treatment for her son overseas. *Id.* at 1076. It is fair to argue, as the Park District does, that *Marchischeck* holds that "caring for" a relative must involve treatment from a medical provider when the employee is taking FMLA leave, including when the family member is traveling away from home.

Although *Marchischeck*'s holding has been adopted by other courts, *see, e.g.*, *Miller v. State of Nebraska Dept. Of Economic Development*, 467 Fed. Appx. 536, 540-41 (8th Cir. 2012); *Tayag v. Lahyey Clinic Hospital*, 632 F.3d 788, 791 n.2 (1st Cir. 2011), the decision's analysis does not grapple with the statutory and regulatory text. Indeed, *Marchicscheck* simply states that "[t]he relevant administrative rule, 29 C.F.R. § 825.116 [now § 825.124(a)], suggests that 'caring for' a child with a 'serious health condition' involves some level of participation in ongoing treatment of that condition," *Marchischeck*, 199 F.3d at 1076. As discussed above, nowhere in the regulation is there any textual support for this limitation. The rule gives two examples of "caring for" a family member: (1) "where . . . the family member is unable to care for his or her own basic medical, hygienic, or nutritional needs or safety, or is unable to transport himself or herself to the doctor"; and (2) "providing psychological comfort and reassurance which would be beneficial to a child, spouse, or parent with a serious health condition

11

who is receiving inpatient or home care." 29 C.F.R. § 825.116(a). Nothing in these examples suggest that "care" must itself be part of ongoing medical treatment.

The Ninth Circuit did provide a more detailed analysis of the "ongoing treatment" limitation in *Gradilla v. Ruskin Mfg.*, 320 F.3d 951 (9th Cir. 2003), *withdrawn per stipulation of parties by Gradilla v. Ruskin Mfg.*, 328 F.3d 1107 (9th Cir. 2003). Although the opinion was withdrawn, the court's thorough analysis in that opinion demands examination. There, an employee accompanied his wife, who had a serious heart condition, to Mexico to attend her father's funeral. Like Ballard, the employee was his wife's primary care giver, and was responsible for administering her medication and calming her down when her heart would act up—something that often occurred when she experienced a stressful event. *Id.* at 954. And, like Ballard, the employee was fired for taking unauthorized leave to accompany his wife to Mexico. The employee brought suit, alleging that his firing was unlawful because he had a right to family care and medical leave under the California Family Rights Act (CFRA), Cal. Govt. Code § 12945.2, the California state analogue to the federal FMLA.[7] Citing *Marchischeck*, the court held that under the CFRA, "an employee who leaves work to travel with and care for a family member with a serious health condition is not entitled to leave when the family member decides, in spite of her serious medical condition, to travel *away from her home* for reasons unrelated to her medical treatment." *Gradilla,*

---

[7] The CFRA was modeled on the federal FMLA and incorporates FMLA regulations to the extent that they do not conflict with California law. Cal. Admin. Code, tit. 2, § 7297.10. Thus, cases interpreting the FMLA apply equally to CFRA claims in the absence of a conflict. *Mora v. Chem-Tronics*, 16 F. Supp.2d 1192, 1202-03 (S.D. Cal. 1998).

320 F.3d at 953 (emphasis added). Thus, *Gradilla* places a geographic restriction on where "care" must be administered, at least when the trip away from home does not have a medical-treatment purpose.

In establishing this limitation, *Gradilla* relied on 29 C.F.R. § 825.116, *id.* at 958, which is now codified at § 825.124(a). As noted above, § 825.116 defined "care" to include situations where, "because of a serious health condition, the family member is *. . . unable to transport himself . . . to the doctor*," as well as "psychological comfort and reassurance which would be beneficial to [a family member] with a serious health condition *who is receiving inpatient or home care*." 320 F.3d at 958 (citing 29 C.F.R. § 825.116(a)) (emphases in original opinion). The term also contemplates situations where the employee might be needed to make arrangements for changes in care, "such as transfer to a nursing home." *Id.* (citing 29 C.F.R. § 825.116(b)) (emphasis omitted). Based on these examples, the court concluded that " 'caring for' a family member with a serious health condition involves some level of participation in ongoing medical or psychological treatment of that condition, *either inpatient or at home*." *Id.* (emphasis in original).

But that reading of 29 C.F.R. § 825.116 is unconvincing because the rule simply provides *examples* of "care" that would qualify for FMLA protections, and does not purport to limit *where* "care" can take place. Other examples in the regulations do not lend themselves to a geographic limitation or an ongoing-treatment limitation ("hygienic" or "nutritional" needs; "psychological comfort and reassurance"). And as helpful as examples can be in interpreting statutory or regulatory text, the most direct

13

explanation of "care" in the regulation is that the term "encompasses both physical and psychological care." 29 C.F.R. § 825.116(a) (now § 825.124(a)). It would be a mistake to use non-exclusive examples to impose limits on that broad and direct definition.

At bottom, the governing statutory text requires only that Ballard sought leave to "care for" her mother, who did have a "serious health condition." 29 U.S.C. § 2612(a)(1)(C). At home, Ballard tended to her mother's basic medical, hygienic, and nutritional needs on a daily basis by cooking her healthy meals, administering insulin shots and medicine, removing fluids from her mother's heart, administering oxygen when needed, and providing transportation—all of which fall squarely within the "care" contemplated by 29 C.F.R. § 825.116. *See* PSOF ¶ 3. Ballard continued to administer medication and look after her mother in Las Vegas. PSOF ¶ 33; Ballard Dep. at 208:23-209:4. That Ballard provided these services to her mother while Sarah Ballard went on an end-of-life trip does not detract from the fact that her mother's basic medical, hygienic, and nutritional needs could not be met without Ballard's assistance.[8] So long as the employee provides "care" to the family member, where the care takes place has no bearing on whether the employee receives FMLA protections.[9]

---

[8] Note that Ballard testified that while in Las Vegas, her mother did visit a medical facility because she was unable to access her insulin and medication in her hotel room on the night of the hotel fire. *See* Ballard Dep. at 206:16-208:6. Although the visit was unplanned, it underscores the importance of Ballard's supervision of her mother during the trip. Left to her own devices, Sarah Ballard would not have received her medications on time and could have suffered serious health consequences.

[9] Indeed, the Park District contends that 29 C.F.R § 825.116(a) supports an employee's FMLA leave request "only if the care giving function takes place in the context of the relative's 'serious illness' and if the care is associated with the relative's receiving some type of 'inpatient or home care.'" R. 48, Def.'s Repl. Br. 5. Under that view, had Ballard simply requested time

14

Accordingly, in light of the Court's interpretation of the term "care," a reasonable jury could find that Ballard "cared for" her mother within the meaning of the FMLA during the time she spent traveling to Las Vegas.

B.

For the sake of completeness (and if there is an appeal, so that the court of appeals has the fullest opportunity to address all of the arguments raised by the parties), the Court now turns to the following question: assuming the Park District is correct—that is, that the FMLA requires that the trip was for ongoing medical treatment—did Ballard provide enough evidence for a reasonable factfinder to conclude that the trip did serve a medical-treatment purpose?

The answer is no. Ballard offers two pieces of evidence to show that the trip was part of her mother's treatment: the December 16, 2008 letter from Horizon Hospice stating that the hospice had worked with the Fairygodmother Foundation to arrange Sarah Ballard's end-of-life trip, and the accompanying affidavit of Roxanne Dominis, an employee of Horizon Hospice. R. 55, Supp. Appx. to PSOF. The first piece of evidence cannot be considered for summary judgment purposes because the letter is inadmissible hearsay and does not meet any of the hearsay exceptions. *See Gunville*

---

off from work to tend to her mother at home, FMLA leave would have been warranted because Sarah Ballard was under the supervision—albeit infrequently—of Horizon Hospice. But Sarah Ballard's ability to care for her own basic medical, hygienic, and nutritional needs remained no less diminished in Las Vegas than it was at home. It is inconsistent to say that Ballard "cared for" her mother at home, but not while they were in Las Vegas. Under the rule endorsed by the Park District and the Ninth Circuit, whether an employee may take leave to tend to the medical needs of a seriously ill family member under the FMLA turns on *where* the care is administered—a distinction that is textually unfounded.

*v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) ("[A] court may consider only admissible evidence in assessing a motion for summary judgment."). It is a letter generated after-the-fact (around seven months after the January 2008 trip), and does not fit the business-record exception to hearsay. *See* Fed. R. Evid. 803(6). The second piece of evidence, Roxanne Dominis's affidavit, while admissible (in the sense of it could be reduced to in-court testimony), does not adequately set forth facts that show that the trip to Las Vegas was arranged in connection with her ongoing treatment at Horizon Hospice. *See* R. 55, Exh. E (Dominis Decl.). Dominis, a Social Work Coordinator at Horizon Hospice, simply states that it is part of the hospice's plan of care to help patients identify and meet end-of-life goals. *Id.* ¶ 4. That is all, one conclusory paragraph in the affidavit. Perhaps if Ballard presented an affidavit from a doctor at Horizon Hospice explaining how the trip to Las Vegas was part of Sarah Ballard's ongoing treatment ( as part of psychological care, for example), Ballard might have been able to establish a triable issue of fact. But because the record before us is left wanting of such evidence, the Court concludes that Ballard has failed to show that if, in the alternative, FMLA leave is subject to an "ongoing treatment" limitation, the end-of-life trip to Las Vegas was part of her mother's ongoing treatment.

### C.

The Park District next contends that even if Ballard were entitled to FMLA protections, she failed to provide sufficient notice of her intent to take leave. The Court disagrees. The FMLA's statutory language and accompanying regulations require an employee to provide notice to her employer when leave is foreseeable. *See* 29 U.S.C.

§ 2612(e)(2)(B); 29 C.F.R. § 825.302(a). Specifically, the employee must provide the employer with "not less than 30 days' notice, before the date the leave is to begin . . . except that if the date of the treatment requires leave to begin in less than 30 days, the employee shall provide such notice as is practicable." 29 U.S.C. § 2612(e)(2)(B).

Even if Ballard were held to the statute's heavier burden of giving 30 days' notice, Ballard has alleged sufficient facts to meet that requirement. There is no dispute that Ballard became aware of her need to take leave on December 19, 2007, which was more than 30 days before her scheduled departure for Las Vegas. R. 45, Pl.'s Resp. to DSOF ¶ 19. Assuming, as we must, that Ballard's factual allegations are true, *see Wohl v. Spectrum Mfg., Inc.*, 94 F.3d 353, 356 (7th Cir. 1996), Ballard has sufficiently raised an issue of fact as to whether she provided the Park District with at least 30 days' notice of her intent to take FMLA leave. Ballard testified that on December 19, 2007, she approached her supervisor, Eric Fischer, to request FMLA leave for the trip. PSOF ¶¶ 17-18. Ballard claims that she handed Fischer a copy of the letter notifying her of the grant, and wrote the requested dates of leave on the back, but that Fischer told her it was too soon and he would get back to her. *Id.* ¶¶ 18, 20. That Fischer denies ever having this conversation and claims not to have learned of Ballard's trip until he received her faxed request in January 2008 does not impact the analysis, R. 49, Def.'s Resp. to PSOF ¶¶ 17-20, because the Court is not in a position to assess the credibility of witnesses or weigh evidence at the summary judgment stage of a proceeding. *Abdullahi v. City of Madison,* 423 F.3d 763, 773 (7th Cir. 2005).

17

The Park District also argues that Ballard's notice was insufficient because she failed to comply with the District's internal procedures for requesting FMLA leave. It is true that "[a]n employer may also require an employee to comply with the employer's usual and customary notice and procedural requirements for requesting leave." 28 C.F.R. § 825.302(d). But even assuming that Ballard did not comply with the Park District's procedures, according to the regulations in effect at the time, "failure to follow . . . internal employer procedures will not permit an employer to disallow or delay an employee's taking leave *if the employee gives timely verbal or other notice.*" 29 C.F.R. § 825.302(d) (eff. until Jan. 15, 2009) (emphasis added). As discussed above, Ballard has alleged sufficient facts to raise a genuine issue as to whether she gave timely verbal notice to Fischer. Thus, it does not matter whether she complied with the Park District's internal procedures.

It is well-established that the notice requirements of the FMLA are not onerous, *Phillips v. Quebecor World RAI, Inc.*, 450 F.3d 308, 311 (7th Cir. 2006); *see also Righi v. SMC Corp.*, 632 F.3d 404, 409 (7th Cir. 2011) ("Ordinarily, an employee's statement to his employer indicating that he needs leave to care for a seriously ill parent would be sufficient to invoke the protections of the FMLA."), and the evidence in the record shows that Ballard has more than enough evidence to convince a factfinder that she has met that burden. Accordingly, this Court finds that Ballard has raised a genuine issue of material fact as to whether she provided the Park District with sufficient notice of her intent to take FMLA leave.

**IV.**

For the reasons stated above, the Park District's motion for summary judgment [R. 36] is denied. Before the October 16, 2012 status hearing, the parties shall confer on what each side believes should be the next step in the litigation.

ENTERED:

*Edmond E. Chang*
_____
Honorable Edmond E. Chang
United States District Judge

DATE: September 29, 2012